**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | |
|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 10-2696-STA-tmp** |
| ) | |
| **NEW BREED LOGISTICS,** ) | |
| ) | |
| **Defendant.** ) | |

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant New Breed Logistics' ("New Breed") Motion for Summary Judgment (D.E. # 116) filed December 17, 2012. Plaintiff Equal Employment Opportunity Commission ("EEOC") filed a Response (D.E. # 124) to New Breed's Motion for Summary Judgment on January 17, 2013. New Breed filed a Reply in Support of Defendant's Motion for Summary Judgment (D.E. # 129) on February 4, 2013. EEOC then filed a Sur-reply (Styled "Plaintiff Equal Employment Opportunity Commission's Supplemental Response in Opposition to Defendant's Motion for Summary Judgment") (D.E. # 135) on March 15, 2013. For the reasons given within, the Court hereby **DENIES** New Breed's Motion for Summary Judgment.

1

## BACKGROUND

### A.  Factual Background

When considering a motion for summary judgment, the reviewing court considers all of the undisputed facts, drawing all inferences in favor of the non-moving party.[1]  Therefore, for the purposes of the instant Motion, the Court accepts the following facts as establish.

### I.      New Breed

New Breed is a supply-chain logistics company with warehouses located, among other places, in Memphis, Tennessee and Olive Branch, Mississippi.  (Valitutto Decl. ¶ 3, D.E. # 117-58; Hearn Dep. 29, D.E. # 124-4.)  One of the Memphis, Tennessee warehouses ("Avaya facility") services shipping and returns for New Breed client Avaya.  (Valitutto Decl. ¶ 3.)  At its Avaya facility, New Breed would employ "temp to hire" or temporary workers for certain positions.  (Pete Dep. 89, D.E. # 117-11; Valitutto Dep. 26.)  To fill these positions on a needs basis, Human Resources Manager Luanne Hearn ("Hearn") would place an order with a temporary agency, Select Staffing, based on recommendations from supervisors.  (Woods II Dep. 125, 127, D.E. # 117-14.)  New Breed does not give temporary workers written discipline or written counseling; rather, if New Breed experiences problems with a temporary worker, the supervisor of the department where the temporary worker is assigned reports the issue to HR, and HR notifies the temporary agency to terminate the assignment.  (Woods II Dep. 132-35, 147; Valitutto Dep. 33; Malone Dep 60-61, D.E. # 117-8; Calhoun Dep. 104-05, D.E # 117-1.)

In December 2007, New Breed hired James Calhoun ("Calhoun") as Supervisor of the Receiving Department at the Avaya facility.  (Calhoun Dep. 58-59.)  As part of his job duties, Calhoun would coordinate incoming products and oversee the warehouse clerks and forklift

---

[1] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

drivers.  (*Id.*)  Calhoun held daily beginning-of-shift meetings to go over safety issues, lay out

the plan for the day's work, and divide up work assignments.  (*Id.* 82.)  Calhoun would often

conduct an end-of-shift meeting as well, where he would encourage and commend his employees

on a job well done.  (*Id.* 83.)  Calhoun would often refer to his department by stating "This is my

area," and Jacqueline Hines ("Hines") once heard Calhoun state "I run this shit."  (Hines I Dep. I

120-21, D.E. # 117-6; Pearson Dep. 167, D.E. # 117-10.)  Calhoun could also request additional

temporary workers and make recommendations for hiring.  (Woods II Dep 126-27, 129.)[2]

  New Breed has a sexual harassment policy ("the Policy") which it states applies to all

employees, temporary and permanent.  (Woods II Dep. 42, 44; Woods II Dep. Ex. 2.)[3]

New Breed provides permanent employees with a copy of the employee handbook, which

contains the Policy, and these permanent employees undergo "New-Hire Orientation" training

regarding the contents of the employee handbook, with refresher courses each year.[4]  (Woods II

Dep. 44, 67; Calhoun Dep. 61; Woods I Dep. 152, D.E. # 117-13; Woods Decl. ¶13, 15, D.E. #

---

[2] There is some dispute between the parties as to Calhoun's ability to transfer employees or whether Calhoun had the ability to end a temporary work assignment on his own.  The Court takes it as undisputed that, at the least, Calhoun could recommend termination.  The Court notes New Breed's objection to Carissa Woods' ("Woods") agreement to the statement "Could Mr. Calhoun have made that decision on his own?"  (Woods Dep. 92.) under Federal Rule of Evidence 602 and **OVERRULES** it.  New Breed seems to read this statement as stating it was possible Calhoun made the decision to terminate Hines.  The Court reads this as an assertion Calhoun had the authority to do so, something that would be within Woods' knowledge as New Breed's Director of Human Resources.

[3] The parties dispute whether New Breed's policy is "zero tolerance," but the Court takes it as undisputed that a policy does exist and that New Breed at least claims it applies to all employees.

[4] EEOC points to the deposition testimony of James Calhoun that he could not recall being trained on sexual harassment as creating an issue of fact here.  However, in the very part of the record EEOC cites, Calhoun states he watched an orientation video on sexual harassment. (Calhoun Dep. 63-64.)  Further, Calhoun's statements he could not recall being trained on sexual harassment are not evidence New Breed did not provide such training, only that he could not recall it.

117-59; Woods Decl. Exs. C, D.)  New Breed has an "open-door" policy that allows both
permanent and temporary employees to report violations of the Policy to any member of
management, any supervisor, or HR; the open-door policy also allows an employee to report
violations anonymously through a toll-free telephone number.  (Woods II Dep. 51-52; Hearn
Dep. 115-116, D.E. # 117-5; Woods Decl. ¶ 12.)  New Breed posted information regarding
applicable federal laws and how to report complaints using the toll-free number outside the break
room at the Avaya facility.  (Franklin Dep. 23-26; Woods II 44-46, 50-51, 52, 67, 71, 76-77;
Woods Decl. ¶¶12,13; Woods Decl. Ex. B, C.)

Select Staffing provides training to its employees regarding Select Staffing's anti-
harassment and retaliation policies.  (Woods II Dep. 47.)  In addition, New Breed requires
temporary workers at the Avaya facility to attend a first-day orientation regarding New Breed's
policies, including the anti-harassment, anti-retaliation, and open-door policies.  (*Id*.)  This
training included a video regarding sexual harassment, including examples of harassment and
reporting procedures.  (*Id.*)

New Breed has an HR procedure manual that includes a template report for investigating
employees to use in preparing investigatory findings.  (*Id.* 54, 59; Woods Decl. ¶13; Woods
Decl. Ex. C.)  When a complaining employee makes a call to the toll-free complaint line, New
Breed's corporate counsel, Richard Valitutto ("Valitutto"), receives an e-mail and designates an
HR representative to respond and conduct an investigation.  (Woods II Dep. 30, 36, 41; Valitutto
Dep. 38-39)  Valitutto, with the designated HR representative, directs any investigation.  (Woods
II Dep. 60-61.)  New Breed completes these investigations as quickly as possible.  (*Id* 58, 60-61.)
Once the investigation is complete, Valitutto reviews a report including the template report and
all supporting documents.  (*Id.* 60-61.)

## II.        **Capricious Pearson**

In 2003, Capricious Pearson ("Pearson") applied for a job with Select Staffing.  (Pearson Dep. 42)  When Pearson applied to Select Staffing, she filled out an application, watched a video about warehouse safety, and took a test.  (*Id.* 43)  Select Staffing then sent her out on an assignment.  (*Id.*)  Pearson does not recall receiving any policies regarding discrimination or employment, but concedes she may have received such.  (*Id.* 45-56.)

Pearson met Calhoun while picking her sister up from work at New Breed.  (*Id.* 109.) Calhoun told Pearson to apply for a job at New Breed and signed her resume.  (*Id.* 105-08) Pearson later applied for a position at the Avaya facility through Select Staffing, indicating Calhoun had recommended her for a position and listing Calhoun as a reference on her application.  (*Id.* 121-22.)[5]  When Pearson interviewed at New Breed, she saw Calhoun walking back and forth in the hallway.  (*Id.* 130.)  Pearson also encountered Calhoun at the exit gate as she was leaving, and Calhoun stared at Pearson, looking up and down.  (*Id.* 131.)

Select Staffing assigned Pearson to New Breed's Avaya facility on April 8, 2008. (Woods Dec. ¶ 8; Woods Dec. Ex. A.)  When Pearson began at the Avaya facility, she concluded Hearn was "the manager over [her] manager," and that "whatever problem I had with the person I was working under, Luanne [Hearn] would be the person I would go to let her know."  (*Id.* 137-38.)  Pearson would go to Hearn with any questions.  (*Id.* 139.)

Pearson began her assignment at New Breed in the Receiving department.  During Pearson's time in Receiving, Calhoun told Pearson he wanted to have a threesome with Pearson

---

[5] The Court **SUSTAINS** New Breed's objection to the motivation for Calhoun's actions as hearsay under Fed. R. Evid. 802.  Pearson recounted Calhoun's motivation as repeated by her sister from a conversation Pearson's sister had with Calhoun.

and Pete.  (*Id.* 170)[6]  Calhoun would ask Pearson to "fuck him," "suck his dick," and "get a

[hotel] room," with him daily.  (*Id.* 163, 173, 269; Pete Dep. 171-72.)[7]  Calhoun would brush

against and lean on Pearson, to the point where he would rub against the front of Pearson's thigh

and breathe down Pearson's neck.  (Pearson Dep. 175-78.)  At one point, Pearson felt ill and

asked to go home early, to which Calhoun responded he "had something to knock that right out."

(*Id.* 176.)

Hearn asked Calhoun for the names of people trained in Receiving for transfer to Returns

and Calhoun provided a list including Pearson and Tiffany Pete ("Pete").  (Calhoun Dep. 73.)

Calhoun then told Pearson he had to let some people go from his department, and would transfer

her to the Returns department.  (Pearson Dep. 180-81.)  New Breed transferred Pearson later that

day.  (*Id.* 183.)  Also that day, Calhoun told Pearson "If I can't have that pussy, no one can."  (*Id.*

182.)[8]

Although Woods was not aware of any documentation that reflects transfer dates, New

Breed documents show Pearson worked in the Returns department as of May 7, 2008.  (Wood

Dep. 61; Culp Decl. ¶ 5, D.E. # 117-57; Culp Decl. Ex. A; Culp II Dep. 45-57, D.E. # 117-3.)

However, New Breed transferred Pearson and Pete to Returns on the same day, and Pete testified

she made her first phone call to the complaint line on May 13, 2008, while still working in the

---

[6] The Court **OVERRULES** New Breed's objection to this testimony under Fed. R. Evid.
802.  EEOC does not offer Calhoun's statements to prove their truth.  *See* Fed. R. Evid.
801(c)(2).

[7] The Court **OVERRULES** New Breed's objection to this testimony under Fed. R. Evid.
802.  EEOC does not offer Calhoun's statements to prove their truth.  *See* Fed. R. Evid.
801(c)(2).

[8] The Court **SUSTAINS** New Breed's objection to Pearson's testimony regarding
Tamara's statements as hearsay.  The Court **OVERRULES** New Breed's objection to this
testimony under Fed. R. Evid. 802.  EEOC does not offer Calhoun's statements to prove their
truth.  *See* Fed. R. Evid. 801(c)(2).

Receiving department.  (Pete Dep. 125, 155; Hearn Dep. 60.)  Construing the evidence in EEOC's favor, the Court determines for the purposes of summary judgment New Breed did not transfer Pearson or Pete until after May 13, 2008.  Pearson received the same hourly wage, worked the same shift hours, and worked in the same facility in Returns as she did Receiving.  (Woods Decl. ¶ 9; Culp Decl. ¶ 4.)

During her first week in Returns, Pearson and a group of coworkers told the Supervisor of the Returns Department Elizabeth Malone ("Malone"), "how nasty [Calhoun] talked to [Pearson]," though Pearson does not know whether Malone heard these statements.  (Pearson Dep. 188.)  Calhoun then approached the group and said "I want to fuck, I want to fuck."  (*Id.* 189.)  Pearson does not recall any conversations with Calhoun after this time.  (*Id.* 190.)

Pearson did not make any formal complaints of sexual harassment to Hearn because "the whole rumor around the company was that [Calhoun] ran the company."  (*Id.* 164.)[9]  Pearson approached Calhoun and told him Hines and other female employees were thinking of recording his foul language, and that he needed to stop immediately.  (*Id.* 172.)  Pearson also told Calhoun to stop harassing her.  (*Id.*)  Calhoun responded that even if someone reported him, Hearn would not do anything about it.  (*Id.*)  Calhoun then told Pearson New Breed would fire anyone reporting Calhoun to Hearn.  (*Id.* 166-67.)  Pearson believed this threat in part because "the ladies were saying he got such-and-such fired[.]"  (*Id.* 166-67.)  Pearson did not complain to Hearn about Calhoun, except that she was not sure whether she mentioned Calhoun's behavior to Hearn when calling to find out why her assignment to New Breed ended.  (*Id.* 207-08.)

---

[9] EEOC disputes this, stating Pearson didn't make a complaint because she was unaware of New Breed's sexual harassment policy.  However, Pearson's direct and uncontradicted testimony is that she did not report Calhoun's behavior because of the rumor he ran the company.

On May 17, 2008, Pete observed Malone and Calhoun conducting a lengthy conversation on the warehouse floor.  (Pete Dep. 144, 228-29.)[10]  On the same day, Malone observed Pete and Pearson incorrectly audit a "Gaylord" (a large shipping box.)  (Malone Dep. 55-56.)  Malone testified she counseled both Pete and Pearson regarding errors in their work once a week for five to six weeks, and had already recommended their termination once before.  (*Id.* 47-50, 62-63, 67-68.)  Later that day, Malone again recommended to Hearn that New Breed end Pete and Pearson's assignments.  (*Id.*)  Hearn contacted Select Staffing to end Pete and Pearson's assignments.  (Malone Dep. 31-32, 55-57; Hearn Dep. 58, 61-62; Franklin Dep. 32-33, D.E. # 117-4.)

Select Staffing telephoned Pearson to let her know her assignment ended.  (Pearson Dep. 199.)  Pearson pleaded for her job back because, in her opinion, she had done nothing wrong.  (*Id.* 198-200.)  Pearson made several phone calls to find out why her employment ended.  (*Id.*)  During one of the phone calls, someone told her she had incorrectly audited a Gaylord.  (*Id.*)[11]  Pearson then went back to the Avaya facility to talk to Malone, who said that she could not discuss the reasons for the end of Pearson's assignment.  (*Id.* 200.)  Pearson assumed Calhoun had something to do with the end of her assignment, based on rumors she heard from former unidentified coworkers.  (*Id.* 201-04.)  Pearson could not make sense of her termination, since she had only made one error while working for Calhoun and none while working under Malone.

---

[10] There appears to be a dispute between the parties as to the contents of this conversation.  It appears from the record EEOC conflates this conversation with a conversation occurring some time earlier.

[11] The Court **OVERRULES** New Breed's objection to this testimony under Fed. R. Evid. 802.  EEOC does not offer Calhoun's statements to prove their truth.  *See* Fed. R. Evid. 801(c)(2).

(*Id.* 192.)  Further, Calhoun did not seem upset by Pearson's one error, which he quickly

corrected and then said "It's been fixed.  A little pussy will take care of it."  (*Id.*  192-93.)

Pearson went to Select Staffing on May 19, 2008, to see if there was anything Select

Staffing could do about the end of her assignment at Avaya.  (*Id.* 206.)  Select Staffing asked

Pearson to prepare a written statement, which she did.  (*Id.*; Pearson Statement, D.E. # 117-32.)

This was the first time Pearson told anyone at Select Staffing about any issues with Calhoun.

(Pearson Dep. 207.)  Pearson testified the portion of the statement reading "I've written down

every word Mr. Calhoun has said to me[,]" was not true, as she could not recall everything

Calhoun said to her.  (*Id.* 214.)

After her assignment at the Avaya facility ended, Pearson only contacted Select Staffing

"a couple of times" regarding a new assignment.  (*Id.* 68, 73-74.)  However, Select Staffing only

had jobs available at $7.50 per hour, rather than the $11.00 per hour Pearson made at the Avaya

facility.  (Franklin Dep. 81; Pearson Dep. 269.)  Select Staffing offered these positions to both

Pete and Pearson, but they declined.  (Franklin Dep. 81-83.)

### III.   Tiffany Pete

Select Staffing assigned Pete to New Breed's Avaya facility on April 1, 2008.  (Pete Dep.

90, 94; Pete Dep. Ex. 8.)  Pete started her assignment in the Shipping department, but after a few

days Calhoun selected her for transfer to Receiving. (Pete Dep. 106; Hines I 188.)

Beginning her second day in Receiving, Calhoun began making sexually suggestive

comments to Pete.  Calhoun told Pete she "had a fat ass."  (Pete Dep. 160-61.)  Calhoun also told

Pete she was "sexy" and that Calhoun wanted to "fuck her."  (*Id.* 157-60.)  Calhoun mentioned

Pete's "booty looked nice in jeans," and requested Pete wear certain jeans to work.  (*Id.* 168-70.)

Calhoun would tell Pete he wished to engage in cunnilingus with her, and to demonstrate his

skill would touch his nose with his tongue.  (*Id.* 157, 166.)  Pete told Calhoun to leave her alone

every day, but Calhoun continued making sexually suggestive comments.  (*Id.* 214.)

On May 13, 2008, Pete called the toll-free compliance line because she believed Calhoun

was cutting her, Pearson, and Hines' hours.  (*Id.* 184-85, 187.)  Pete did not identify herself in

her initial phone call.  (*Id.* 193, 196; May 13, 2008 Alertline, D.E. # 117-39; Valitutto Dep. 37.)

Calhoun, however, heard rumors Pete was going to make a call to the hotline and informed

Hearn he heard these rumors.  (Calhoun Dep. 97, 101-02.)  After Pete made this phone call,

Calhoun told Pete "A motherfucker can run up to the front if they want to.  You're going to lose

your job."  (Pete Dep. 162.)

Valitutto received a report regarding Pete's complaint on May 13, 2008.  (Valitutto Dep.

38;  May 13, 2008 Alertline.)  Valitutto provided the complaint to Woods on May 14, 2008 and

designated Woods to respond.  (Woods II Dep. 82-83, 87, 109, 120, 172; Valitutto Dep. 39;

Woods Decl. ¶ 3.)  Woods interviewed Calhoun on May 14, 2008, and Calhoun denied sexually

harassing his staff.  (Woods II Dep. 87, 92; Notes of Calhoun Meeting, D.E. # 117-32.)  Woods

reported the results of her interview to Valitutto, and they decided to gather more information.

(Woods II Dep. 88, 95.)  On May 15, 2012, Valitutto sent a response to Pete stating "The caller

is thanked for providing the information.  This matter will be immediately investigated.  If the

caller has any additional information or can provide additional facts or the names of employees

that may be witnesses to this behavior, it would greatly assist the investigation." (Valitutto Dep.

41; Fax Transmission, D.E. # 117-45.)

As discussed above, New Breed ended Pete's assignment to the Avaya facility on May 17,

2008.  Pete attempted to find other work through Select Staffing, but was only offered a job

paying $3.50 less per hour than New Breed.  (Franklin 79-83.)

On May 19, 2008, Pete went to Select Staffing's office and prepared a written statement regarding her belief she was sexually harassed. (Pete Dep. 208-11.; Pete Statement, D.E. # 117-40.) Select Staffing notified Woods that two temporary employees (Pete and Pearson) alleged they were sexually harassed. (Woods II Dep. 95-96.) Select Staffing faxed both Pete and Pearson's complaints to Woods. (*Id.* 97.) Woods notified Valitutto Pete had identified herself as the caller to the compliance line and could give Woods more information. (Woods II Dep. 98.) Woods spoke with both Pearson and Pete on May 19, 2008. (*Id.* 98-99.)

After Pete's first call to the toll-free compliance line, she contacted Christopher Partee ("Partee") to see if he would serve as a witness. (Pete Dep. 134-36.) Pete made two follow-up calls to the compliance line on May 21, 2008. (Woods II Dep. 101; Pete Dep. 221-23) In the second call, Pete identified Partee as a corroborating witness. (Valitutto 47-49.) Pete placed a fourth call to the compliance line on May 28, 2008. (Woods II Dep. 102-03.)

Woods compiled her findings and recommended to Valitutto that New Breed terminate Calhoun on May 27, 2008. (Woods II 117; May 27, 2008 Memo, D.E. # 117-55.) New Breed terminated Calhoun on May 30, 2008. (Calhoun Dep. 128-29.)

Woods and Valitutto testified Culp and Hearn did not know of the investigation into Calhoun until May 22, 2008. (*Id.* 103, 159; Valitutto Dep. 52-53.) However, EEOC presents evidence Hearn knew of Pete and Pearson's complaints on May 19, 2008. (Fax Transmission.) Further, Woods informed Culp and Hearn she was at the Avaya facility to conduct a sexual harassment investigation and that Calhoun was the subject. (Woods Dep. 127-28.)

IV.   **Jacquelyn Hines**

Hines applied to the Avaya facility through Select Staffing on the advice of her sister Karen, who told her there were openings and that Hines should list Calhoun as a reference,

11

because Calhoun could "get her in" at New Breed.  (Hines I Dep. 97.)   Hines did so, and Select Staffing hired Hines and assigned her to the New Breed Avaya facility on April 1, 2008.  (Hines I Dep. 97-98; Woods Decl. ¶ 8; Woods Decl. Ex. A).

After her initial training and orientation, New Breed assigned Hines to the Shipping department.  (Hines I Dep. 78, 85.)  As with Pete, after a few days Calhoun selected Hines for transfer to Receiving.  (*Id.* 188.)  After the transfer, Calhoun would make sexually suggestive statements to Hines on a daily basis.  (*Id.* 115-16.)  Calhoun would tell Pete he'd like to "get in her jeans." (*Id.*)  Calhoun also remarked to Pete that her posterior "Must be jelly, 'cause jam don't shake like that." (*Id.*)  If Pete bent over to pick something up, Calhoun would stare down her blouse and exclaim that he'd like to "put his dick between [her] titties and nut[12] all over them."  Calhoun frequently asserted he would like to "sop [Pete] up with a biscuit," or would like to perform cunnilingus on her.  Finally, after showing up late for work one day, Hines told Calhoun "James, get the hell out of my face, I don't want to hear that shit today." (*Id.* 135; Pete Dep. 214).

Although previously, Calhoun had told Hines to notify him if she would be late so that he could clock her in, later that day Select Staffing cautioned Hines about tardiness at the Avaya facility. (Hines I Dep. 104-06, 135.) Several days later, Calhoun announced to the Receiving department "I run that shit."[13]  Soon thereafter, on April 29, 2008, New Breed terminated Hines. (Woods Decl. ¶ 8; Woods Decl. Ex. A)

---

[12] "Nut" is vernacular for ejaculation, or to ejaculate.  *See* "Nut", Urban Dictionary, http://www.urbandictionary.com/define.php?term=nut (last visited March 21, 2013).

[13] The Court **OVERRULES** New Breed's objection to this testimony under Fed. R. Evid. 802.  EEOC does not offer Calhoun's statements to prove their truth.  *See* Fed. R. Evid. 801(c)(2).

On May 22, 2008, Woods interviewed Hines as part of New Breed's investigation of Pete's complaint to the toll-free compliance line. (Hines II Dep. 243.) During this conversation, Hines told Woods Calhoun sexually harassed her. (*Id.* 243-44.)

On May 28, 2008, Hines, without using Select Staffing, applied for and obtained permanent employment at New Breed's Olive Branch facility. (Hines I Dep. 158, Hines II Dep. 225-26.) In her application, Hines did not list Select Staffing or New Breed as a previous employer, because she felt New Breed ended her assignment due to sexual harassment. (*Id.*) Hines also did not complete the section of her application asking for information on relatives working at New Breed, instead marking it "N/A." (Hines II Dep. 218-22; Hines II Ex. 8) Hines started at the Olive Branch facility on June 11, 2008. (Hines II Dep. 221-23; Hines II Ex. 8.)

After Hines began at the Olive Branch facility, Woods saw Hines' name and pulled Hines' personnel file to see "how she had got hired." (Woods Dep. 95-96.) Woods knew she'd interviewed Hines regarding Pete's sexual harassment claim. (*Id.* 95) On June 20, 2008, New Breed sent Hines home from work and later notified Hines she'd been terminated. (Woods Decl. ¶ 10.) New Breed fired Hines because she answered "no" on her employment application in response to the question of whether New Breed had employed her in the past. (Woods Dep. 94-97, 111-12.) However, Hines' answer was correct, as Hines was only a temporary employee at the Avaya facility. (*Id.* 111-12.)

## V.    Christopher Partee

Calhoun was Partee's immediate supervisor at New Breed. (Partee Dep. 34, D.E. # 117-9; Calhoun Dep. 66.) Calhoun testified he saw Partee sitting outside while on duty, then returning to clock out when his transportation arrived. (Calhoun Dep. 66.) Partee testified he never stayed late without specific approval from Calhoun. (Partee Dep. 172-74.) Hearn,

Woods, and Calhoun testified Calhoun went to Culp on May 19, 2008, and Calhoun and Culp reviewed video of Partee engaging in this behavior.  (Hearn Dep 79; Woods II Dep. 83, 86; Calhoun 66-68.)  However, Culp testified he did not recall whether he viewed any video regarding Partee.  (Culp Dep. 123-24.)  New Breed failed to preserve this video footage.  (Order on EEOC's Supplemental Motion for Sanctions at 7, D.E. # 109.)[14]

Culp requested Hearn look into Partee's timekeeping, including Partee's conduct on May 19th, Partee's taking short meal periods to garner unapproved overtime, Partee's frequent misplacement of his badge, and Partee's requests to be clocked in by management.[15]  (Hearn Dep. 74-75, 78-79, 83; Hearn Dep. Ex. 3; Woods II Dep. 82-83, 86, 88, 145; Calhoun Dep. 70.) However, Calhoun testified Partee only requested Calhoun clock Partee in once due to a misplaced employee badge.  (Calhoun Dep. 117.)  Hearn testified that after a review of Partee's timekeeping she found Partee was manipulating and falsifying his time records.  (Hearn Dep. 74; Hearn Typewritten Notes, D.E. # 117-17.)[16]  However, Hearn also testified that she generally takes the manager's word for it on claims of this nature.  (Partee Dep. 123-24).  Hearn then either suspended Partee pending further investigation or called Partee into her office and either

---

[14] However, Judge Pham's Order also denied EEOC's request for an adverse inference instruction.  (Order on EEOC's Supplemental Motion for Sanctions at 19.)

[15] The Court notes EEOC disputes whether an investigation occurred, because the Facility Manager at the Avaya facility, Sheldon Culp ("Culp") testified he did not remember if an investigation occurred.  (Culp Dep 123-24.)  This does not create a dispute of material fact, as it does not contradict Hearn's testimony that such an investigation did take place.

[16] The Court notes EEOC disputes these findings.  However, EEOC's proffered evidence does not dispute that Hearn made these findings, only that Partee had permission from Calhoun to take the actions Hearn discovered.

terminated him or suspended him pending review on May 21, 2008. (Hearn 78-79, 81; Disciplinary Action Form, D.E. # 117-18; Partee Dep. 119-22.)[17]

Hearn testified that she had no knowledge of Partee's participation in New Breed's investigation of Calhoun on May 21, 2008 or at any later date before New Breed claims it terminated Partee. (Hearn Dep. 86, 87, 125, 127.) However, Select Staffing provided Pearson's May 19, 2008 statement to Hearn and Woods on May 19, 2008. (Franklin Dep. 64-67.) This statement identified Partee as a corroborating witness to Calhoun's behavior. (Woods II Dep. Ex. 6.) Calhoun also warned Hearn that employees were going to complain about his behavior before May 21, 2008. (Calhoun Dep. 100-03.)

Valitutto approved Partee's termination on May 27, 2008. (Hearn 71, 85, 86, 89-91; Separation Notice, D.E. # 117-19; Email from Valitutto to Hearn, D.E. # 117-20.) Valitutto testified he was unaware of Partee's involvement in the Calhoun investigation at that time. (Valitutto Dep. 63.) However, New Breed had Pearson's written statement on May 19, 2008. (Franklin Dep. 64-67.) Pete identified Partee as a witness in her complaint to the toll-free compliance line, and Valitutto received documentation of this call by May 22, 2008. (Valitutto Dep. 49-50.) Woods also submitted a memorandum to Valitutto on May 27, 2008, identifying Partee as a witness to sexual harassment. (Woods Dep. 73-74; Valitutto Dep. 54-55.)

Partee told Pete prior to May 21, 2008 that Partee would be willing to be a witness against Calhoun. (Partee Dep. 162-64; Pete Dep. 133-37.) Calhoun stated he was unaware Partee might be a potential witness against him. (Calhoun Dep. 163-64.) However, again, Pearson's May 19, 2008 statement to Select Staffing identified Partee as a corroborating witness. (Franklin Dep. 64-67; Woods II Dep. Ex. 6.) Partee testified Calhoun's attitude towards him

---

[17] The parties dispute whether Hearn terminated Partee on May 21, 2008 or suspended him pending investigation. The Court does not find the difference material for present purposes.

changed drastically a few days before his termination.  (Partee Dep. 126-28.)  Calhoun also

submitted a statement on May 23, 2008, identifying Partee and saying Raphael Smith told

Calhoun that Partee would support women making sexual harassment claims.  (May 23, 2008

Email from Calhoun to Woods, D.E. # 124-16.)  Calhoun was also aware Partee had witnessed

numerous sexually harassing statements Calhoun made.  (Partee Dep. 77-81, 84-85, 87-89, 90-

92.)  Partee also told Calhoun "From my knowledge, you better leave them women alone.

You're going to get hurt."  (*Id.* 91-92.)

### B.  Procedural Background

Pete first completed a questionnaire with the EEOC on May 29, 2008.  (Pete Dep. 236-

37; Intake Questionnaire, D.E. # 117-42.)  EEOC prepared a charge for Pete, which Pete signed

and dated June 13, 2008.  (Pete Dep. 237-38; EEOC Charge, D.E. # 117-43.)  The EEOC issued

a determination of Pete's claim and invited New Breed to conciliate on June 22, 2010.  (Decl. of

Deputy District Director at 19, D.E. # 115-1.)  During conciliation, EEOC attempted to

conciliate Pete, Pearson, and Hines' claims arising out of the Avaya facility.  (*Id.* at 21-32.)

Conciliation failed, and EEOC issued a Notice of Conciliation Failure on July 30, 2010.  (*Id.* at

32.)

EEOC filed the instant suit on September 23, 2010, alleging causes of action against New

Breed for sexual harassment against Pete, Pearson, and Hines and for retaliation against Pete,

Pearson, Hines, and Partee.  (Compl., D.E. # 1.)  On August 30, 2011, EEOC requested leave of

the Court to file an amended complaint so as to add a second charge against New Breed for

retaliation against Pete at the Olive Branch facility.  (Mot. Leave to File an Am. Compl., D.E. #

23.)  New Breed opposed this Motion in a Response dated September 13, 2011.  (Resp. Opp. to

Mot. Leave to File Am. Compl., D.E # 30).  The United States Magistrate Judge granted this

16

Motion on November 7, 2011.  (Order Granting Pl.'s Mot. Leave to File Am. Compl., D.E. # 60.)

In the instant Motion for Summary Judgment, New Breed argues the Court should grant summary judgment on EEOCs claims for sexual harassment because Calhoun was not a supervisor, and EEOC has not shown that New Breed knew or should have known of Calhoun's behavior; in the alternative, New Breed argues that if Calhoun is a supervisor, the *Faragher/Ellerth* affirmative defense applies in that New Breed reasonably attempted to prevent and remediate sexual harassment and Pete, Pearson, and Hines unreasonably failed to use New Breed's remediation procedures.  New Breed also argues the Court should grant summary judgment on EEOC's retaliation claims against Pete, Pearson, Partee, and Hines ("Claimants") under the *McDonald Douglas/Burdine* framework; New Breed asserts EEOC cannot make out its prima facie case for retaliation with respect to the Claimants and that New Breed can rebut the prima facie case if so made by showing evidence of a legitimate, nondiscriminatory cause for termination.  New Breed also argues the Court should grant summary judgment on EEOC's second claim of retaliation as against Hines, as it was outside the scope of EEOC's investigation and conciliation.

EEOC responds Calhoun is a supervisor, so it is inappropriate to analyze New Breed's knowledge as if Calhoun was a coworker only.  EEOC also states the *Faragher/Ellerth* defense does not apply, as this defense only applies to an employer who has taken no tangible employment action.  Further, EEOC argues it makes out its prima facie case for retaliation as to all Claimants, and New Breed's proffered nondiscriminatory reasons are in fact pretextual.  Finally, New Breed argues its second claim for retaliation as against Hines is covered under the Sixth Circuit's "single filing" rule, and separate investigation and conciliation is unnecessary.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[18]  In reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party.[19]  As a result, the "judge may not make credibility determinations or weigh the evidence."[20]  When the moving party supports the motion with documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings, but must present some "specific facts showing that there is a genuine issue for trial."[21]  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[22]  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[23]  When determining if summary judgment is appropriate, a court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[24]  A court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential

---

[18] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharms., Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).

[19] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[20] *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

[21] *Celotex*, 477 U.S. at 324.

[22] *Matsushita*, 475 U.S. at 586.

[23] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[24] *Id*. at 251-52.

to that party's case, and on which that party will bear the burden of proof at trial.[25]  In the Sixth

Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [her]

asserted causes of action."[26]

## ANALYSIS

New Breed, in its Motion for Summary Judgment, first argues it cannot be vicariously

liable for the hostile work environment Calhoun created.  New Breed then argues EEOC cannot

make out the prima facie case for retaliation under Title VII for any Claimant.  Finally, New

Breed argues EEOC failed to investigate or conciliate its claim of retaliation against Hines at the

Olive Branch facility.  Because a failure to investigate or conciliate a claim goes to exhaustion of

administrative remedies and thus the Court's subject-matter jurisdiction,[27] the Court will discuss

this argument first.  The Court will then address EEOC's sexual harassment and retaliation

claims.

## Failure to Investigate or Conciliate

New Breed argues the Court should grant summary judgment on EEOC's retaliation

claim with respect to Hines' employment at the Olive Branch facility on jurisdictional grounds.

The Sixth Circuit limits the scope of an EEOC complaint in district court to "the scope of the

---

[25] *Celotex*, 477 U.S. at 322.

[26] *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 857 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

[27] *See Vinson v. Ford Motor Co.*, 806 F.2d 686, 687 (6th Cir. 1986) (filing charge with EEOC a prerequisite to district court's jurisdiction).

EEOC investigation reasonably expected to grow out of the charge of discrimination."[28]  A court should dismiss claims not within the reasonable scope of the EEOC investigation.[29]

The Court finds the EEOC's claim regarding retaliation at the Olive Branch facility reasonably grew out of the investigation of the initial claims.  Courts in the Sixth Circuit follow the so-called "single filing rule."[30]  Under the single filing rule, a claimant may avoid the requirement of filing an EEOC charge "where a substantially related non-filed claim arises out of the same time frame as a timely filed claim[.]"[31]  As New Breed points out, under the single filing rule, a district court must make a threshold finding of "whether the EEOC made an attempt at conciliation."[32]  However, as the *Keco Industries* panel also instructed, "[t]he EEOC is under no duty to attempt further conciliation after an employer rejects its offer."[33]  This applies even where, as here, matters that "can be reasonably expected to grow out of the initial charge of discrimination" become part of the litigation.[34]

The Court finds it reasonable to expect, under the circumstances as presented to it, Hines' claim for retaliation at the Olive Branch facility would grow out of Pete's initial complaint.  Pete filed a charge with EEOC alleging sexual harassment and retaliation.  During its investigation of Pete's claims, EEOC discovered evidence of sexual harassment and retaliation against Hines and

---

[28] *EEOC v. Bailey Co., Inc.*, 563 F.2d 439, 446 (6th Cir. 1977).

[29] *Id.*

[30] *EEOC v. Wilson Metal Casket Co.*, 24 F.3d 836, 840 (6th Cir. 1994).

[31] *Id.*

[32] *EEOC v. Keco Indus., Inc.*, 748 F.2d 1097, 1102 (6th Cir. 1984).

[33] *Id.* at 1101-02.

[34] *Id.* at 1102.

Pearson, and retaliation against Partee.  EEOC, after moving to litigation and after New Breed rejected its conciliation attempts, discovered New Breed had allegedly retaliated against Hines. The Court cannot see how a second charge of retaliation stemming from the same protected activity as alleged in the first charge of retaliation would not reasonably grow out of the investigation of the first charge.

The Court also determines the second retaliation charge arose out of the same time frame as Pete's original charge, satisfying the second requirement of the single-filing rule.  Pete's employment at New Breed began April 1, 2008.  New Breed first took adverse action against Hines at the Olive Branch facility on June 20, 2008.  The Court finds for these purposes, a discharge that occurs less than three months from the beginning of harassing behavior arises within the same time period as the harassing behavior.

Since the Court finds EEOC's retaliation charge reasonably grew out of Pete's harassment claim, it hereby **DENIES** New Breed's Motion for Summary Judgment on this claim for failure to investigate or conciliate.

### Hostile Work Environment

An employer may not discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment because of the employee's sex.[35]  "A plaintiff may establish a violation of Title VII [of the Civil Rights Act of 1964] by proving that the discrimination based on sex created a hostile or abusive work environment."[36]  Hostile work environment discrimination occurs "[w]hen the workplace is permeated with discriminatory

---

[35] 42 U.S.C. §2000e-2(a)(1).

[36] *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999) (citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66 (1986); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 825 (6th Cir. 1997)).

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[37]   A plaintiff asserting a hostile work environment claim based on sex "must show (1) she is a member of a protected class, (2) she was subjected to unwelcome sexual harassment, (3) the harassment was based on her sex, (4) the harassment created a hostile work environment; and that (5) the employer is vicariously liable."[38]

New Breed, in its Motion for Summary Judgment, does not dispute the first four prongs of the *Williams* analysis.  Therefore, for purposes of this Motion, the Court assumes EEOC has met its burden on these points.  However, New Breed disputes the fifth prong of vicarious liabilty on two theories.  First, New Breed asserts it is not vicariously liable because Calhoun was a coworker to the Claimants, and EEOC has not established New Breed knew or should have known of the sexual harassment and unreasonably failed to take prompt and corrective action.  Second, New Breed asserts that even were Calhoun not a coworker, New Breed could assert an affirmative defense that New Breed exercised reasonable care to prevent and correct sexually harassing behavior and the Claimants unreasonably failed to take advantage of corrective or preventive opportunities.

New Breed argues the standard for a coworker hostile work environment claim should apply to this case.  Under this standard, the EEOC must establish the defendant in a sexual harassment case "knew or should have known of the charged sexual harassment and failed unreasonably to take prompt and appropriate corrective action."[39]   In order to apply this standard

---

[37] *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citing *Meritor*, 477 U.S. at 64, 67).

[38] *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 347 (6th Cir. 2005) (citing *Williams*, 187 F.3d at 560-61).

[39] *Fenton v. HiSAN*, 174 F.3d 827, 829-30 (6th Cir. 1999).

on a motion for summary judgment, the Court must find the uncontradicted facts establish Calhoun was a coworker rather than a supervisor.  The Court determines there are disputed issues of material fact precluding summary judgment on this issue.

For these purposes, a supervisor is "an individual who serves in a supervisor position and exercises significant control over plaintiff's hiring, firing, or conditions of employment."[40]  The plaintiff bears the burden of establishing another employee exercises significant control over the plaintiff's hiring, firing, or conditions of employment.[41]

EEOC presents the Court with evidence that at least raises a question of fact as to whether Calhoun was a supervisor.  New Breed employed Calhoun as Supervisor of the Receiving Department at the Avaya facility.[42]  Although Calhoun's specific job title may not be dispositive as to his job functions, it could at least create a question in the mind of a reasonable juror.  Further, the evidence in the record shows Calhoun would lead department meetings twice a day, would give staff instructions throughout the day, oversaw clerks and forklift drivers, and otherwise exercised control over the Receiving department.  The Court is not prepared to conclude no reasonable juror could decide, based on these facts, Calhoun was a coworker rather than a supervisor.

New Breed asserts that Calhoun had no direct hiring and firing authority.  Instead, New Breed claims Culp made all personnel decisions with respect to both temporary and permanent employees, and that Hearn had to make the actual decision to place a Select Staffing employee in

---

[40] *Newton v. Ohio Dep't of Rehab. & Corr.-Toledo Corr. Inst.*, No. 11-3681, 2012 WL 3631493, at *5 (6th Cir. Aug. 23, 2012) (citing *Pierce v. Commn. Life Ins. Co.*, 40 F.3d 796, 803 (6th Cir. 1994) (internal quotations and citation omitted)).

[41] *Summerville v. Ross/Abbott Labs.*, 98-3517, 1999 WL 623786, at * 8 (6th Cir. Aug. 10, 1999) (per curiam).

[42] Req. Adm. ¶ 16, D.E. # 135-1.

the Receiving department.  New Breed also maintains Calhoun, despite his ability to issue

written discipline to permanent employees, had no authority to do so for temporary employees.

At best, however, these facts create an issue of material fact as to whether Calhoun was a

supervisor.  They do not mandate the Court grant summary judgment in New Breed's favor.

Since the Court determines there is an issue of triable fact as to whether Calhoun is a supervisor,

the Court finds it premature to engage in analysis under *Fenton* regarding New Breed's

knowledge of Calhoun's actions.

New Breed then argues that, if Calhoun is a supervisor, an affirmative defense shields it

from vicarious liability for Calhoun's actions.  Generally, where a plaintiff claims a supervisor

created a hostile work environment, the employer will be vicariously liable.[43]  However, the

*Faragher/Ellerth*[44] defense allows an employer that has taken no "tangible employment action"

to establish an affirmative defense "(a) that the employer exercised reasonable care to prevent

and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee

unreasonably failed to take advantage of any preventive or corrective opportunities provided by

the employer or to avoid harm otherwise"[45]

At the outset, the Court notes New Breed fails to establish the prerequisite to assert the

*Faragher/Ellerth* defense: that they have taken no tangible employment action.  "A tangible

employment action constitutes a significant change in employment status, such as hiring, firing,

---

[43] *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009).

[44] Referring to *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).

[45] *Ellerth*, 524 U.S. at 765.

24

failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[46]

New Breed argues that Pete, Pearson, and Hines' transfers to the Returns department did not constitute tangible employment action. The Court agrees. For a transfer to be a tangible employment action, it must be or in some way undesirable.[47] A tangible employment action is a "materially adverse change in the terms and conditions of . . . employment."[48] New Breed presents undisputed evidence Pete, Pearson, and Hines' transfers did not affect their work hours, their rate of pay, or work location. The Court determines New Breed has met their burden of production as to the transfers for this affirmative defense, and EEOC appears to concede the issue.

However, the parties contest whether the end of Pete, Pearson, and Hines' assignments at New Breed constituted tangible employment action. As noted above, a tangible employment action must be materially adverse. Both parties present authority from district courts in other circuits to support their positions. New Breed cites cases from the Eastern and Western Districts of Texas for the proposition that the end of a temporary employment assignment does not rise to the level of adverse action.[49] The Court finds the facts of *Reith* and *Casas* distinguishable from the present case. The *Reith* plaintiff's work assignment ended due to the completion of a project,

---

[46] *Id.* at 761.

[47] *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 349 n.1 (6th Cir. 2005).

[48] *White v. Burlington N. & Santa Fe Ry.*, 364 F.3d 789, 795 (6th Cir. 2004).

[49] *Reith v. TXU Corp.*, No. 4:05CV33, 2006 WL 887413, at *6 (E.D. Tex. Apr. 4, 2006); *Casas v. Sw. Staffing, Inc.*, No. EP-04-CV-0424-FM, 2006 WL 504226, at *7. The Court notes these cases discuss adverse action in the context of the prima facie case of retaliation under Title VII, not tangible employment action in the context of the *Faragher/Ellerth* defense.

25

and he turned down several other assignments from his employment agency.[50]  Here, Pete, Pearson, and Hines' work assignment did not end because of the completion of a project; rather, New Breed terminated them, putatively for poor performance and attendance issues.  Too, although New Breed maintains Pete, Pearson, and Hines failed to meaningfully pursue additional work through Select Staffing, EEOC contends Pete and Pearson did not pursue other opportunities because Select Staffing had no other comparable listings, while Hines obtained a permanent position at a different New Breed location from which she was eventually terminated. In *Casas*, the harasser was not the plaintiff's supervisor.[51]  Here, a question of fact remains as to whether Calhoun was Pete, Pearson, and Hines' supervisor.

In contrast, EEOC cites a case from the Northern District of Mississippi to support the proposition that ending a temporary work assignment is an adverse employment action.[52]  The Northern District of Mississippi noted "[t]emporary employment is an important thread in the fabric of our economy, not a license to trample roughshod on Title VII . . . . an employer may not *terminate . . .* employment on account of [a claim of sexual harassment]."[53]

In light of the Sixth Circuit's explanation in *Burlington Northern* that a tangible employment action is one that is materially adverse,[54] the Court finds the reasoning of the Northern District of Mississippi persuasive for the purposes of this Motion for Summary

---

[50] *Reith* at *6.

[51] *Casas* at *4.

[52] *EEOC v. IPS Indus., Inc.*, No. 2:10-CV-168, 2012 WL 448345, * 10 (N.D. Miss. Sept. 26, 2012) (citing *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004)).  The Court notes *IPS Industries* involves the harassing actions of a James Calhoun, possibly the same James Calhoun discussed herein.

[53] *Id.*

[54] *Burlington N. & Santa Fe Ry.*, 364 F.3d at 795

Judgment.  It seems untenable to assert an action effectively cutting a temporary employee's pay from $11 per hour to $7.50 per hour is not materially adverse, even if the temporary employee refused the new work assignment.  Therefore, the Court is not prepared to find, as a matter of law, that ending a temporary work assignment under these circumstances is not a tangible employment action.  Since the Court makes no such finding, consideration of the *Faragher/Ellerth* defense would be premature at this stage of litigation.

Because a question of material fact remains about whether Calhoun was a supervisor or coworker, the Court cannot grant summary judgment for New Breed on the basis of their asserted prompt and reasonable corrective actions.  Because the Court cannot hold, as a matter of law, that the end of a temporary work assignment is not a tangible employment action, it cannot grant summary judgment based on the *Faragher/Ellerth* affirmative defense.  Therefore, the Court **DENIES** New Breed's Motion for Summary Judgment on the issue of EEOC's hostile work environment claim.

### Retaliation

New Breed next contends EEOC has not made out its prima facie case for retaliation.  To analyze a claim for retaliation under 42 U.S.C. § 2000e-3(a), the Court turns to the familiar *McDonnell Douglas/Burdine*[55] framework.[56]

A plaintiff makes out a prima facie case for retaliation under this framework by establishing

> (1) [the complainant] engaged in activity protected by Title VII; (2) this exercise
> of protected rights was known to the defendant; (3) the defendant thereafter took

---

[55] Referring to *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[56] *Charles v. Postmaster Gen.*, 97 Fed. App'x 536, 538 (6th Cir. 2004) (citing *Jacklyn v. Shering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 928-30 (6th Cir. 1999)).

an adverse employment actions against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action.[57]

A defendant may rebut this prima facie case by articulating a "legitimate, nondiscriminatory reason" for the adverse employment action.[58]  If a defendant articulates such a reason, the plaintiff must produce credible evidence the asserted reason is pretextual.[59]  Such evidence must show either "(1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge." [60] The Sixth Circuit instructs district courts the plaintiff's burden under the *McDonnell Douglas/Burdine* framework is "not onerous" and "easily met".[61]

Discussing what constitutes protected activity, the Supreme Court noted

[t]he Title VII antiretaliation provision has two clauses, making it "an unlawful employment practice for an employer to discriminate against any of his employees ... [1] because he has opposed any practice made an unlawful employment practice by this subchapter, or [2] because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."[62]

These two clauses are typically denominated the "opposition clause" and the "participation clause."  Courts generally analyze actions before the filing of formal proceedings under Title VII

---

[57] *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 860 (6th Cir. 1997).

[58] *Burdine*, 450 U.S. at 253; *McDonnell Douglas*, 411 U.S. at 802.

[59] *Burdine*, 450 U.S. at 253; *McDonnell Douglas*, 411 U.S. at 804.

[60] *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (emphasis in original) *rev'd on other grounds, Geiger v. Tower Automotive*, 579 F.3d 614 (6th Cir. 2009).

[61] *See, e.g., Avery Dennison*, 104 F.3d at 861.

[62] *Crawford v. Metro. Gov't Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 274 (2009).

under the opposition clause.[63]  "Although courts should liberally construe the opposition clause, 42 U.S.C. § 2000e-3(a) does not protect all opposition activity."[64]  Title VII does not protect opposition where "'the employee's conduct in protest of an unlawful employment practice so interferes with the performance of his job that it renders him ineffective in the position for which he was employed.'"[65]  "When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always 'constitutes the employee's *opposition* to that activity"[66]

Hines

The Court finds EEOC makes out their prima facie case with respect to the end of Hines' assignment at the Avaya facility.  A reasonable juror could draw the inference Hines engaged in opposition to Calhoun's harassing behavior by stating "James, get the hell out of my face, I don't want to hear that shit today."  Similarly, Calhoun knew of Hines' opposition.[67]  In the context of a retaliation claim, an adverse employment action is one sufficiently harmful that it "could well dissuade a reasonable worker from making or supporting a charge of discrimination."[68]  As

---

[63] *See Booker v. Brown & Williamson Tobacco Co., Inc.,* 879 F.2d 1304, 1312 (6th Cir. 1989).

[64] *Holden v. Owens-Ill., Inc.*, 793 F.2d 745, 751 (6th Cir. 1986) (internal quotations omitted.)

[65] *Id.* (quoting *Rosser v. Laborers' Int'l Union*, 616 F.2d 221, 223 (5th Cir. 1980).

[66] *Crawford*, 555 U.S. at 851.

[67] The Court notes it cannot impute Calhoun's knowledge to New Breed for the purposes of establishing some other decisionmaker knew Hines, Pearson, or Pete told Calhoun to stop. *See Gallagher v. C. H. Robinson Worldwide, Inc.*, 567 F.3d 263, 276 (6th Cir. 2009).  With respect to Hines' assignment to the Avaya facility, there are facts in the record indicating Calhoun had a hand in the decision to fire Hines.

[68] *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

previously noted, the termination of a temporary work assignment constitutes an adverse action, so EEOC makes out this portion of the prima facie case.  Finally, EEOC adduces sufficient evidence for a reasonable juror to infer a causal link between the end of her work assignment and her protected activity.

To show a causal link, all that is required is to "proffer evidence 'sufficient to raise the inference that her protected activity was the likely reason for the adverse action.'"[69]  A plaintiff may show a causal link through close temporal proximity between an adverse employment action and a protected activity.[70]  New Breed fired Hines shortly after she told Calhoun to leave her alone.  Hines' entire employment at the Avaya facility lasted less than a month.  A reasonable juror could infer from the short period between Hine's opposition to Calhoun's advances and her termination that Calhoun retaliated against an employee who refused his sexual advances by ending her work assignment to New Breed.

New Breed attempts to rebut this prima facie case by articulating a legitimate, non-discriminatory reason for the end of Hines' assignment.  New Breed states Hines had attendance problems, and was late to work several times.  However, under the minimal showing required to survive summary judgment, EEOC presents evidence New Breed's proffered reason is pretextual.  Hines testified Calhoun told her to notify him when she would be late, so that he could falsify timekeeping records for her.  It was only after Hines rejected Calhoun's advances that her attendance became a problem.  A reasonable juror could conclude from these facts New Breed offers Hines' attendance issues as mere pretext.

---

[69] *Zanders v. Nat'l R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990) (quoting *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982)).

[70] *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).

Because EEOC makes out its prima facie case with respect to this claim, and presents evidence New Breed's asserted legitimate, nondiscriminatory reason for ending Hines' assignment at the Avaya facility is pretextual, the Court finds this claim inappropriate for summary judgment under the *McDonnell Douglas/Burdine* framework.  Therefore, the Court hereby **DENIES** New Breed's Motion for Summary Judgment with respect to this claim.

Similarly, the Court finds EEOC makes out its prima facie case with respect to New Breeds' termination of Hines at the Olive Branch facility.  Hines engaged in a protected activity; beyond her verbal opposition to Calhoun's advances, by the time New Breed ended her employment at the Olive Branch facility she also participated in New Breed's investigation of the sexual harassment charges against Calhoun.  As the person investigating the harassment charges against Calhoun, Woods knew of Hines' protected activity, and took adverse action in terminating Hines subsequent to learning of the protected activity.  The only dispute is whether there was a causal connection between this adverse action and Hines' protected activities.

As discussed above, a plaintiff may show a causal connection through close temporal proximity between a protected action and an adverse employment action.  Woods interviewed Hines as part of the harassment investigation on May 22, 2008.  New Breed terminated Hines' employment at the Olive Branch facility less than a month later, on June 20, 2008.  Such temporal proximity is enough, at this stage of the proceedings, to infer a causal link.[71]

Again, New Breed presents evidence of a legitimate, nondiscriminatory reason for Hines' termination to rebut the prima facie case.  New Breed asserts Hines falsified her employment application by stating she had never worked for New Breed in the past and by leaving sections of

---

[71] *See Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (finding three months between learning of protected activity and adverse action sufficient for inference of causation.)

the application blank.  However, EEOC presents sufficient evidence that this reason did not actually motivate or was insufficient to cause Hines' termination to survive summary judgment. Woods testified she pulled Hines' employment application in part because she remembered interviewing Hines as part of New Breed's investigation of Calhoun.  Further, Woods testified Hines' answer on the question of past employment was correct, as Hines was only a temporary employee.  For the purposes of the present Motion, EEOC has satisfied their burden to show evidence sufficient for a reasonable juror to conclude New Breed's proffered reason for Hines' termination was either insufficient or did not actually motivate New Breed.

Because EEOC makes out its prima facie case with respect to New Breed's termination of Hines at the Olive Branch facility, and because EEOC presents evidence New Breed's asserted reason for this termination is pretextual, the Court finds this claim inappropriate for summary judgment under the *McDonnell Douglas/Burdine* framework.  Therefore, the Court **DENIES** New Breed's Motion for Summary Judgment on this claim for failure to make out a prima facie case for retaliation.

<u>Pete and Pearson</u>

EEOC makes out its prima facie case with respect to Pete and Pearson.  Pete engaged in protected activity by opposing Calhoun's behavior: asking him to "leave me alone."  Pete did so "every day" in response to Calhoun's advances.  Like Pete, Pearson told Calhoun to stop his harassing behavior.  Pearson also told Calhoun that Pete and others planned to record Calhoun's comments.  District courts in the Sixth Circuit have found that simply telling a supervisor to stop

engaging in harassing behavior constitutes opposition.[72]  The Court agrees with its sister courts

on this point, and holds these statements to Calhoun constituted protected oppositional behavior.

   With respect to the knowledge prong of the prima facie case, Calhoun knew about Pete

and Pearson's requests to stop.  There is, however, some question as to whether the jury might

impute Calhoun's knowledge to any relevant decisionmaker.  EEOC presents evidence Malone

made the decision to end Pete and Pearson's assignments at the Avaya facility.  Under the theory

of "cat's-paw" liability, "if a supervisor performs an act motivated by [discriminatory] animus

that is *intended* by the supervisor to cause an adverse employment action, and if that act is a

proximate cause of the ultimate employment action, then the employer is liable[.]"[73]  EEOC

presents evidence of two conversations between Calhoun and Malone.  The first conversation

occurred sometime in April 2008.  In the first conversation, Calhoun told Malone that Pete and

Pearson had bad attitudes and they were not good workers.  Calhoun further told Malone to keep

an eye on Pete and Pearson.  The second conversation occurred on May 17, 2008, the same day

New Breed terminated Pete and Pearson.  Construing these facts in the light most favorable to

EEOC, a reasonable juror could come to the conclusion Calhoun engaged in these conversations

for the purpose of retaliation against Pete and Pearson.  That juror could also come to the

conclusion these conversation caused Malone to view Pete and Pearson in a less-favorable light,

causing Malone to end their assignment at the Avaya facility, making the conversations the

---

[72] *See Berthiaume v. Appalachian Christian Vill. Found., Inc.*, No. 2:07-CV-46, 2008 WL
4138112, at *4 (E.D. Tenn. Sept. 4, 2008) ("[A]n employee has 'engaged in the most basic form
of protected activity when she told her supervisor . . . to stop his offensive conduct.'") (quoting
*Odgen v. WaxWorks, Inc.*, 214 F.3d 999, 1007 (8th Cir. 2000)); *Reed v. Cracker Barrel Old
Country Store, Inc.*, 113 F.Supp.2d 1055, 1070 (M.D. Tenn. 2000) ("[A] plaintiff who tells his
immediate supervisor that he must stop sexually harassing her is 'engaging in the most basic
form of protected conduct.'") (quoting *Quarles v. McDuffie Cnty.*, 949 F.Supp. 846, 853 (S.D.
Ga. 1996)).

[73] *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1194 (2011) (emphasis in original).

proximate cause of Pearson's termination. Thus, EEOC makes out the second, third, and fourth prongs of their prima facie case: if Calhoun told Malone to keep an eye out for Pete and Pearson and did so in order to get Malone to terminate Pete and Pearson, and Malone did terminate Pete and Pearson because Calhoun poisoned the well against them, then there is knowledge, an adverse action, and a causal link between the protected action in opposition to Calhoun and Malone's decision to terminate Pete and Pearson.

As an alternate holding to the cat's-paw liability theory above, the Court finds EEOC makes out its prima facie case for retaliation with respect to Pete's call to the toll-free complaint line on May 13, 2008. Such a call falls within the rubric of opposition. The Court holds a reasonable juror could find New Breed knew Pete placed a phone call to the complaint line. At the very least Pete's phone call put New Breed on notice *someone* opposed Calhoun's behavior. EEOC presents evidence Calhoun heard rumors Pete and others were planning on calling the complaint line regarding his behavior, and told Hearn about these rumors. Although New Breed points out Calhoun did not submit a written statement to Hearn naming Pete until May 18, 2008, after New Breed ended Pete's assignment on May 17, 2008, Calhoun gave Hearn a verbal warning before submitting a written statement. A reasonable juror might conclude this conversation occurred before Pete's termination, satisfying the second and third prongs of EEOC's prima facie case. Finally, EEOC meets their burden on the causality prong of the prima facie case. Were the Court to assume the maximum amount of time occurred between Pete's termination and New Breed's learning of her protected activity of four days, EEOC easily raises an inference of causality based on temporal proximity.[74] Were this temporal proximity not enough by itself, Calhoun told Pete "A motherfucker can run up to the front if they want to.

---

[74] *See DiCarlo v. Potter*, 358 F.3d 408, 421-22 (6th Cir. 2004) (Thirteen days between protected activity and memo recommending firing sufficient to find causation).

You're going to lose your job," a statement that could raise an inference of retaliatory intent on New Breed's part.

New Breed asserts essentially the same legitimate, non-discriminatory reason for ending both Pearson and Pete's assignments at the Avaya facility to rebut this prima facie case. New Breed asserts both had performance issues culminating in their failure to correctly unpack and audit a Gaylord shipping box. EEOC again argues this reason is mere pretext by stating it has no basis in fact. In support of its contention of ongoing performance issues, New Breed points to numerous counseling sessions between Malone and Pearson and Pete that occurred over several weeks. EEOC argues this evidence is not credible, as Malone only supervised Pearson and Pete for a period of several days, not weeks. Further, EEOC points to the timing of the May 17, 2008 conversation between Malone and Calhoun. While suspicious timing alone "cannot be the sole basis for finding pretext,"[75] it "is a strong indicator of pretext when accompanied by some other, independent evidence."[76] Coupled with the discrepancy between the asserted counseling sessions and the time Malone spent as Pete and Pearson's supervisor, the Court finds this "suspicious timing" sufficient evidence that a reasonable juror could conclude New Breed's asserted reason for terminating Pete and Pearson had no basis in fact.

Because EEOC makes out its prima facie case with respect to its claims of New Breed's retaliation against Pearson and Pete, and offers evidence that New Breed's asserted legitimate, nondiscriminatory reason for terminating Pearson and Pete is pretextual, the Court finds these claims inappropriate for summary judgment under the *McDonnell Douglas/Burdine* framework.

---

[75] *Donald v. Sybra*, 667 F.3d 757, 763 (6th Cir. 2012).

[76] *Seeger v. Cincinnati Bell Tel. Co., LLC.*, 681 F.3d 274, 285 (6th Cir. 2012) (internal quotation omitted).

Therefore, the Court hereby **DENIES** New Breed's Motion for Summary Judgment with respect to these claims.

Partee

Finally, the Court finds EEOC makes out its prima facie case for retaliation with respect to Partee. As discussed above, telling a harasser to stop his harassment is a protected activity. EEOC adduces evidence Partee told Calhoun "you better leave them women alone." Partee also engaged in protected oppositional behavior when he informed Pete he would serve as a witness in Pete's internal complaint against Calhoun. New Breed learned of this protected behavior on May 19, 2008, when Pete submitted her written statement listing Partee as a witness. New Breed first took adverse action against Partee on May 21, 2008 when it suspended him, ostensibly for time theft. Pete, on May 22, 2008, again engaged in oppositional behavior when he provided a statement to New Breed regarding Calhoun's behavior.[77] New Breed then took more adverse action against Partee on May 27, 2008 by terminating Partee's employment. Therefore, EEOC makes out the first three prongs of its prima facie case with respect to Partee: Partee took part in protected activity; New Breed knew of the protected activity; and, subsequent to knowing about the protected activity, New Breed took adverse action against Partee. As noted above, a plaintiff may make out the causation prong of the prima facie case for retaliation through mere temporal proximity.[78] Here, New Breed first took adverse action a mere two days after learning of

---

[77] New Breed disputes the characterization of this statement as a protected activity because "it was not a complaint opposing unlawful conduct under Title VII." New Breed cites no authority for this proposition, and the Court fails to see how it could construe voluntarily providing a statement detailing a harasser's conduct to a company investigator as anything but an activity opposing the behavior.

[78] New Breed began its investigation of Partee's alleged time theft on May 21, 2008, so the heightened standard applicable when the employer contemplates adverse action prior to the protected activity does not apply.

Partee's protected activity.  New Breed argues the people involved in the decision to suspend and terminate Partee (Culp, Calhoun, and Hearn) did not know of Partee's protected behavior prior to making the decision to suspend.  However, there is evidence in the record that both Calhoun and Hearn knew that Pete made a complaint through the toll-free complaint line.  Further, Calhoun knew Partee had told Calhoun to stop his harassing behavior.  It is no great stretch to presume Calhoun surmised Partee would serve as a witness for Pete's complaint.  Under the minimal standards to survive summary judgment, New Breed makes out its prima facie case.

New Breed attempts to rebut EEOC's prima facie case by asserting it suspended and eventually terminated Partee for engaging in time theft.  New Breed asserts its investigation of Partee's behavior as indicative of a good faith belief Partee was indeed stealing time by falsifying time records.  However, EEOC presents evidence both that New Breed's proffered reason is not based in fact and that it was not the real motivation for terminating Partee. Towards the factual basis of New Breed's time theft charge against Partee, EEOC asserts the only person who remembers reviewing video evidence of Partee's actions is Calhoun himself, as Culp stated in his deposition he did not remember anything about the Partee investigation. Further, EEOC states New Breed destroyed and cannot produce the video evidence showing Partee's alleged time theft.  To dispute Partee's alleged time theft was the real motivation for New Breed's adverse actions, EEOC introduces evidence Hearn merely "rubber stamped" Calhoun's decision to suspend and terminate Partee, and that Hearn "goes by the word of the supervisor" when it came to Calhoun's allegations regarding Partee's alleged time theft.  EEOC also presents evidence Calhoun told Partee on a few occasions not to worry about returning late from lunch and that Calhoun would "fix" the time records; and that the only times Partee stayed late was with approval from Calhoun.  Calhoun's excuse of Partee's behavior raises an inference

37

New Breed management routinely excused timekeeping issues like those alleged.  Finally, the timing of the adverse actions in close conjunction to Partee's protected activities supplements any inference of pretext a juror might draw.  Therefore, the Court finds EEOC sufficiently raises questions of fact regarding New Breed's asserted reason for terminating Partee.

Because EEOC makes out their prima facie case and presents evidence that New Breed's proffered legitimate, nondiscriminatory reasons for firing Partee was pretextual, the Court finds summary judgment inappropriate under the *McDonnell Douglas/Burdine* framework with respect to the claim of New Breed's retaliation against Partee.  The Court hereby **DENIES** New Breed's Motion for Summary Judgment with respect to this claim.

## CONCLUSION

Because there are disputed issues of material fact as to whether Calhoun is a supervisor, the Court **DENIES** New Breed's Motion for Summary Judgment on EEOC's sexual harassment claims on the basis of New Breed's lack of knowledge.  Because New Breed took tangible employment action against Pete, Pearson, and Hines, the Court **DENIES** New Breed's Motion for Summary Judgment on EEOC's sexual harassment claims based on the *Faragher/Ellerth* affirmative defense.  Because EEOC makes out its prima facie case for retaliation with respect to all Claimants under the *McDonell Douglas* framework and presents evidence New Breed's asserted reasons for termination of all Claimants are pretextual, the Court **DENIES** New Breed's Motion for Summary Judgment based on the *McDonnell Douglas/Burdine* burden-shifting framework.  Because EEOC's claim regarding Hines' termination from the Olive Branch facility reasonably grew out of Pete's initial EEOC charge, the Court **DENIES** New Breed's Motion for Summary Judgment on the basis of lack of jurisdiction.

**IT IS SO ORDERED.**

38

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: March 22, 2013